Michael J. Coffino (Admitted Pro *Hac Vice*)
Jaime J. Santos (JS-3361)
COFFINO LAW GROUP, LLP
201 Spear Street, Suite 1100
San Francisco, CA 94105
Telephone (415) 426-3530
Fax (415) 426-3531

Attorneys for Defendant
CHINA NORTHEAST
PETROLEUM HOLDINGS LIMITED

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | No. 12-CV-8696 (NRB) ECF |
| Plaintiff, | |
| vs. | |
| CHINA NORTHEAST PETROLEUM HOLDINGS LIMITED; WANG HONGJUN, (a/k/a Hongjun Wang); JU GUIZHI (a/k/a Guizhi Ju); and JIANG CHAO (a/k/a/ Chao Jiang) | **ORAL ARGUMENT REQUESTED** |
| Defendants, | |
| JIANG MENGFU (a/k/a Mingfu Jiang); and SUN JISHUANG (a/k/a Jishuang Sun), | |
| Relief Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF CHINA NORTH EAST PETROLEUM HOLDINGS, LIMITED TO DISMISS COUNTS ONE AND TWO OF THE COMPLAINT

## TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II.     STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

        The Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

        The Company's Excellent Record of Disclosure . . . . . . . . . . . . . . . . . . . . . . .3

        The Restatement Process and Discovery and
        Disclosure of Third-Party Payments to Vendors . . . . . . . . . . . . . . . . . . . . . .5

        The Work of John Lees Associates,
        Remedial Measures and a Clean Bill of Health . . . . . . . . . . . . . . . . . . . . . . 6

III.    COUNTS 1 AND 2 of the COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

        A.     Plaintiff Fails to Allege with Particularity the Circumstances
               Constituting Fraud on the Part of the Company . . . . . . . . . . . . . . . . . . . .9

               1.     The Complaint Fails to Allege *Scienter* With Respect to Company
                      Statements About The Use of Public Capital . . . . . . . . . . . . . . . . . 10

               2.     The Complaint Fails to Allege *Scienter* With Respect to Company
                      Statements Regarding Related-Party Transactions . . . . . . . . . . . . . 11

        B.     Plaintiffs Cannot Plead the Company had the Requisite *Scienter* by
               Alleging Collective Conduct of Corporate Employees . . . . . . . . . . . . . . . . 12

        C.     Even *Arguendo* Alleged Misstatements of the Individual
               Defendants can be Attributed to the Company, the Complaint
               Fails Adequately to Plead Their *Scienter* . . . . . . . . . . . . . . . . . . . . . . . 12

V.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

i

# TABLE OF AUTHORITIES

Page

**Cases**

*Aaron v. SEC*, 446 U.S. 680 (1980) ...........................................................................10

*ATSI Communs., Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87 (2d Cir. 2007).........................13

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ....................................................10

*In re Pfizer Inc. Sec. Litig.*, 584 F.Supp. 621 (S.D.N.Y. 2008)....................................9

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001)..........................................................10

*Lawrence v. Cohn*, 325 F.3d 141 (2d Cir. 2003) ........................................................9

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F. 3d 702 (7th Cir. 2008) ...............12

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) .........................................................2

*SEC v. Mudd*, 885 F. Supp. 654 (S.D.N.Y. 2012) .......................................................9

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190
  (2d Cir. 2008) ........................................................................................................12

*Tellabs v. Makor Issues & Rights*, 551 U.S. 308 (2007)..................................10, 11, 12

*Wood ex rel. U.S. v. Applied Research Assocs., Inc.,* 328 F. App'x 744 (2d Cir. 2009) ................9

**Rules**
F.R.C.P. 9(b).......................................................................................................9, 12

Defendant China North East Petroleum Holdings, Limited ("NEP" or the "Company") respectfully submits this memorandum of law in support of its motion to dismiss Counts One and Two of the Complaint (the "Complaint"), pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").

## I.  INTRODUCTION

The Complaint attempts to transform business transactions that an independent forensic audit—on which the SEC heavily relies—found were entirely for legitimate corporate purposes and lacked any indicia of fraud into a nefarious scheme of the Company to avoid disclosure of certain alleged related party transactions the SEC admits were unknown to the Board and its Audit Committee.  Burdened with this ambitious project, Plaintiff employs a pattern of innuendo and conclusory allegations, avoids facts that are essential to the pleading record and fails to account for well-established principles of applicable law.

First, after relying on the report of an independent forensic auditor the Audit Committee of the Company hired, Plaintiff conspicuously omits the clean bill of health the audit gave the Company after a comprehensive investigation.

Second, after making much ado about two capital raises that the Company disclosed would generate funds to allow expansion of operations and payment of debt, Plaintiff fails to mention that the Company spent *even more* than the amounts raised for the precise purposes disclosed to the public.

Third, Plaintiff alleges, on the one hand, that the Board and Audit Committee were unaware of the various related-party transactions—which are the foundation for this action—but then alleges, on the other, that the Company engaged in a purposely fraudulent course of conduct involving the very transactions of which its Board and Audit Committee were unaware.

Fourth, the Complaint lacks a single allegation to show any intent of the Company to deceive the public or conceal the truth or a single allegation of corporate motive or any corporate benefit as a result of the alleged disclosure errors.

Fifth, the Complaint contains no particularized allegations that the Company was aware of, participated in, or benefited from any alleged fraud.  Rather, the Complaint focuses on purported mismanagement, unnamed disclosure violations, and other classic indicia of an impermissible attempt to plead "fraud by hindsight."

Sixth, the Complaint lacks the requisite particularized allegations against the individual defendants, the alleged conduct of which the Complaint purports to attribute to the Company.

The result is the Complaint fails to satisfy the stringent standards for alleging *scienter*. These pleading flaws are basic and beyond cure.

## II.  STATEMENT OF THE FACTS [1]

The Company

Founded in 2003, NEP is an independent oil company engaged in the production of crude oil in Northern China.  Complaint ¶¶ 2, 11.  NEP is a pioneer in private oil exploration and production industry in China, and the first Chinese non-state-owned oil company to trade on the NYSE Amex ("Amex").  Exh. 1.  NEP completed its Over the Counter Bulletin Board listing in 2004 and began trading on Amex in June 2009.  Complaint ¶¶ 12, 20; Exh. 2 at 4.  NEP was delisted after two years of costly SEC investigation that caused the Company to fall behind on its public filings while spending millions of dollars in legal and auditing fees in an attempt to keep

---

[1]  The facts in this Statement are drawn from the Complaint and its referenced and incorporated documents, public filings with the SEC and other matters of which the Court may take judicial notice on this motion to dismiss.  *See e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).  These documents, including documents that are judicially noticeable, are attached to the Declaration of Jaime J. Santos and numbered Exhibit numbers 1 thru 26 and cited in this memorandum as "Exh. ___."

up a barrage of SEC comment letter questions.  Complaint ¶ 12; Exh. 3.  NEP has since agreed to deregistration.  Exh. 4.

 NEP operates its oil wells through subsidiaries within four oilfields in Northern China's Jilin Province.  Exhs. 1; 2 at 4.   It has a 20 year lease with Petro China to which the Company sells 100% of its produced crude oil for use in China.  NEP discovers and extracts the oil through its subsidiaries.  Exhs. 5 (2010 10-K at 5); 2 (2009 10-K at 6).

NEP raised approximately $31.9 million in the U.S. capital markets in September and December 2009.  Complaint ¶ 2.  NEP planned and disclosed that it would use the net proceeds from the capital raises for "working capital, capital expenditures, acquisition of new technologies or businesses, and investments," (Complaint ¶ 20) and for "repayment of debt."  Complaint ¶ 23.

NEP did as promised, spending $38.6 million in expansion and loan repayment.  For example, on September 27, 2009, on the heels of the first capital raise, NEP, through a 90%-owned subsidiary, purchased Song Yuan Tiancheng Drilling Engineering Company, Limited for $13 million.  Exhs. 6 (Oct. 1, 2009 8-K); 2 (2009 10-K at 3).  Then, on January 12, 2010, NEP used $15 million to repay in full its 8% secured debenture issued to Lotusbox.  Exhs. 7 (Jan. 13, 2010 8-K); 2 (2009 10-K at 22).  Finally, on January 19, 2011, NEP, through a subsidiary, purchased Sunite Right Banner Shengyuan Oil and Gas Technology Development Company, Limited for $10.6 million in cash and 5.8 million shares of common stock.  Exhs. 8 (Jan. 20, 2011 8-K); 5 (2010 10-K at 5).

<u>The Company's Excellent Record of Disclosure</u>

On February 23, 2010, NEP disclosed that, as a result of preparing responses to an SEC comment letter, it discovered non-cash errors in earlier filings regarding the accounting for certain warrants attached to debt financings in 2008 and 2009.  Exh. 9.  The warrant accounting

issue was whether and to what extent the warrants, normally an equity instrument but attached to a debenture in this case, should instead be classified as a liability.

NEP also disclosed an error regarding certain prior "ceiling test" impairment calculations and related depreciation, depletion and amortization for its oil and gas properties. *Id*. The accounting issue there was determining when, if at all, changes in oil prices and expenses of operation had converged to create an properly valuation impairment that required different accounting treatment.

The accounting issues the Company faced, like many similarly situated public companies, were complex, difficult to apply and subject to high degrees of professional judgment in application. In fact, the SEC expressly recognized that errors would occur in their application and went to unusual lengths to assist smaller companies to understand how to apply the accounting rules, which were new and in a state of flux. Exh. 10.

The Company also disclosed that because the accounting errors were all "non-cash charges," it would not report any change to its previously disclosed *revenues, cash balances or liquidity* and *capital resources* disclosures. The Company noted that further disclosures about the impact of changes in accounting treatment would likely be forthcoming. Exh. 9.

Less than two weeks later, on March 8, 2010, as previously announced, the Company disclosed the *quantitative* impact of the accounting errors by quarter. In addition, the Company identified errors in calculating the carrying value of its oil and gas properties. The Company also announced that with the forthcoming amendments to financial statements, it would disclose a material weakness regarding its internal controls over financial reporting. The Company further announced it had engaged oil and gas financial accounting consultants with expertise in the additional reporting requirements for oil and gas producing companies to assist with the

Company's efforts to comply with the complex rules governing this area.  Again, the Company

stated that it would be issuing further disclosures.   Exh. 11.

> The Restatement Process and Discovery and
> Disclosure of Third-Party Payments to Vendors

Thus, with the assistance of a new accounting consultant that possessed particularized

expertise in accounting for oil and gas reserve assets, the Company undertook to prepare

restatements of certain of its prior public filings, specifically, its annual and quarterly reports for

2008 and its quarterly reports for 2009, to address the accounting errors reflected in the treatment

of the warrants and the valuation of its oil and gas properties.   It also forged ahead with the

preparation of its 2009 10-K.  Exhs. 2, 11.

On April 15, 2010, the Company announced a delay in the filing of its 10-K for 2009

because it was unable to prepare and review all necessary information and disclosures without

incurring unreasonable effort and expense.  Exh. 12.

The next day, April 16, 2010, the Company announced that:

> [I]n the process of the Company's 2009 year end audit review, the Company identified
> certain potential internal control deficiencies over financial reporting in connection with
> certain expenditures relating to business development activities and the accounting
> treatment of certain of the Company's accounts payables.  The Board of Directors has
> directed and authorized the Audit Committee of the Board of Directors to conduct a
> thorough review of the situation and to determine what corrective action, if any, should
> be taken.

The Company also announced that internal examination of the newly discovered internal

control deficiencies would delay the filing of the restatements and the 2009 10-K.

> Until the completion of the review of the Company's internal control deficiencies, the
> Company is unable to finalize its amended and restated financial reports or its audited
> financial statements for the year ended December 31, 2009.  The Company is working
> expeditiously to complete the internal control review, and expects to file amended and
> restated annual and quarterly reports for the periods ending March 31, 2008, June 30,
> 2008, September 30, 2008, December 31, 2008, March 31, 2009, June 30, 2009 and
> September 30, 2009, and its Annual Report on Form 10-K for the year ended December
> 31, 2009 on or before June 15, 2010. The Company has engaged an external consultant

with expertise in financial accounting and reporting, including specifically the additional reporting requirements affecting oil and gas producing companies, to assist with the Company's efforts to maintain effective internal controls over financial reporting.

Exh. 9.

The Company then announced, as expected, that Amex had deemed the Company out of compliance with its continuing listing criteria (in Sections 134 and 1101 of the Amex Company Guide) solely because of the failure of NEP to file its 2009 10-K timely.   Exh. 6.  Amex stated, in consequence, an intention to suspend public trading in Company stock unless prompt corrective action was taken.   Exh. 9.

In early April, 2010, the Board discovered for the first time a financial statement line item showing a debt to a shareholder.  Complaint ¶ 33.  On April 19, 2010, the Audit committee retained John Lees Associates ("JLA") to conduct a forensic audit.  Complaint ¶ 35.

<u>The Work of John Lees Associates, Remedial Measures and a Clean Bill of Health</u>

On May 27, 2010, the Company announced that JLA preliminarily found that in 2009, cash transfers occurred between the bank accounts of the Company and its subsidiaries and the personal bank accounts of Wang, the Company's chief executive officer, and Ju, a Company director and mother of Mr. Wang.  The Company also stated:

> The forensic audit has confirmed that some of the transferred funds were used to pay the Company's expenses.  To date, *there is no indication that any of the funds were used for personal purposes*.  The forensic audit is ongoing.  (Emphasis supplied.)

Exh. 13.

Immediately following the JLA preliminary report, the Board adopted specific policies regarding assets and cash transfers, specifically that:

> none of its assets, including cash, should be transferred or paid to any officer or director of the Company or its subsidiaries for any purpose without the approval of the Audit Committee other than (i) payment of transfers pursuant to service agreements between the Company and its officers and directors duly authorized and adopted by the Board of

Directors or its committees; or (ii) reimbursement of reasonable expenses not exceeding $10,000 in any given week.

Complaint ¶ 42; Exh. 13.

The Board took additional remedial corporate action, including:

(i)     Accepted the resignation of its chief financial officer, Mr. Yang Zhang, and appointed Mr. Andrew Kan from JLA to serve as interim acting chief financial officer until a permanent chief financial officer is duly appointed.

(ii)    Accepted the resignation of Ms. Ju as a director of the Company.

(iii)   Accepted the resignation of Mr. Hongjun Wang as the Chairman of the Board, but allowed him to continue as a director pending the outcome of the current forensic audit.

(iv)   Appointed one of the Company's independent directors, Mr. Edward Rule, as Chairman of the Board.

(v)    Placed Mr. Hongjun Wang on administrative leave as chief executive officer pending the outcome of the current forensic audit.

(vi)   Appointed the Company's independent director, Mr. Jingfu Li, as the interim acting chief executive officer.

Complaint ¶ 46; Exh. 13.

On May 26, 2010, Amex halted trading in the stock of the Company for the *sole* reason that the Company had failed to file timely its 2009 10-K.   Exh. 13.  On June 18, 2010, however, the Company announced that Amex had "determined that, in accordance with Section 1090 of the Company Guide, the Company's Compliance plan makes a reasonable demonstration of the Company's ability to regain compliance with Amex's continued listing standards."   Exh. 16.

On July 10, 2010, JLA issued its final report ("JLA Report"), which included a number of transactions with shareholders that was news to the Board.  Complaint ¶¶ 6 and 42; Exh. 14.  The Board further learned, and disclosed, that the news from JLA was very positive:

After a rigorous review of all of the transactions that occurred in the Company's cash accounts during 2009, JLA issued a report on July 10, 2010 which reported that <u>no evidence exists to indicate that funds were misappropriated, stolen or otherwise misused by anyone.  Further, the JLA report did not find any material misrepresentations in the Company's prior financial reports filed with the SEC.</u>   (Emphasis supplied.)

Complaint ¶ 36; Exh. 15.

The JLA conclusion that there was no misappropriation or misuse of company funds is conspicuously absent from the 24-page Complaint.  Complaint ¶¶ 4, 5, 50, 57, 58, 62 & 71.

## III.    COUNTS 1 AND 2 of the COMPLAINT

Counts One and Two are directed towards all defendants including the Company.  Count One alleges the Company violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], by publicly declaring it planned to use net proceeds from its public offerings to, among other things, acquire new business and pay off debt, and because the Company knew, or was reckless or negligent in not knowing, that offering proceeds would not be used for these purposes. Complaint ¶ 57.  In addition, Count One alleges the Company violated Section 17(a) by not disclosing certain money transfers after the offering.  *Id*.  Alternately, the Complaint alleges the Company violated Section 17(a) through a pattern of related-party transactions, raising funds with intent to divert and diverting them for improper purposes to corporate insiders and family members, and concealing misconduct from the investing public.  *Id*. ¶ 58.

Count Two is essentially identical to Count One except it alleges the Company violated Section 10(b) and Rule 10b-5 of the Exchange Act [15 U.S.C. § 77j(b); 17 C.F.R.§ 240.10b-5. The Complaint alleges that the Company failed to make certain disclosures regarding money transfers after the offering.  Complaint ¶ 61.  It also alleges that the Company violated Section 10(b) and Rule 10b-5 by engaging in a pattern of related-party transactions, raising funds with intent to divert (and diverting) them for improper purposes, diverting said funds to corporate insiders and family members, and concealing this conduct from the investing public.  *Id*. ¶ 62.

The Complaint also alleges that the alleged misconduct that forms the basis for Counts 1 and 2 against the Company occurred <u>without</u> knowledge of the Board or its Audit Committee. Complaint ¶¶ 6 & 42.

## IV.   ARGUMENT

As we now show, Counts 1 and 2 of the Complaint are fatally flawed because they fail to allege facts sufficient to plead *scienter* as to the Company.

### A.   Plaintiff Fails to Allege with Particularity the Circumstances Constituting Fraud on the Part of the Company

To state a cause of action under Section 10(b) and Rule 10b-5, plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter." *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003). The only distinction for a Section 17(a) claim is that it is for fraud in the offer and sale of securities. *See* 15 USC § 77q. Under Federal Rules of Civil Procedure 9(b), fraud claims under Sections 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act are subject to "a heightened pleading standard" that requires "a party to state with particularity the circumstances constituting fraud or misstate." *SEC v. Mudd*, 885 F. Supp. 654, 660 (S.D.N.Y. 2012) (quoting *In re Pfizer Inc. Sec. Litig.*, 584 F.Supp. 621, 632-33 (S.D.N.Y. 2008).

Fraud allegation under either 10(b) or 17(a) must comply with Rule 9(b), which requires that the plaintiff "state with particularity the circumstances constituting fraud." F.R.C.P. 9(b). This rule "permits *scienter* [guilty knowledge] to be demonstrated by inference, [but] this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. An ample factual basis must be supplied to support the charges." *Wood ex rel. U.S. v. Applied Research Assocs., Inc.*, 328 F. App'x 744, 747 (2d Cir. 2009) (internal quotation marks omitted).

Among other things, Plaintiffs must plead facts that give rise to a strong inference of *scienter*, *i.e.,* a strong inference of fraudulent intent.  *Tellabs v. Makor Issues & Rights*, 551 U.S. 308 (2007); *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001); *Aaron v. SEC*, 446 U.S. 680, 695 (1980) (*scienter* required for violation of Section 17(a) and Section 10(b)); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976).

In determining whether Plaintiffs have alleged facts sufficient to give rise to a strong inference of *scienter*, the Court must consider *all* reasonable inferences, including "plausible nonculpable explanations for the defendant's conduct."  *Tellabs*, 551 U.S. at 323.

This standard requires that the Court consider all the facts in the complaint and other appropriate sources to determine whether *collectively* they give rise to a strong inference of *scienter*.  *Tellabs*, 551 U.S. at 322-23.  The Court must engage in a "comparative evaluation" to consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."  *Id.* at 323.  An inference of *scienter* must be more than merely plausible or reasonable, "it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id*. at 324.

> ### 1.   The Complaint Fails to Allege *Scienter* With Respect to Company Statements About Use of Public Capital

The Complaint alleges that NEP made repeated representations that it planned to use net proceeds from the public sale of its securities to expand operations and pay off debt, but that the proceeds were not so used.  *See* Complaint ¶¶ 4, 5, 50, 57, 58, 62 & 71.  But the record is rife with specific contrary facts that show the Company *did* spend not only what it promised to spend, but actually more, on the expressly stated purposes.[2]

---

[2] In addition to failing to plead the element of *scienter*, these allegations fails to support fraud because they are not misstatements at all.

Shortly after the 2009 offerings, NEP spent $38.6 million to purchase Song Yuan Tiancheng Drilling Engineering Company, Limited, Sunite Right Banner Shengyuan Oil and Gas Technology Development Company, Limited.  It also repaid in full its 8% secured debenture issued to Lotusbox.  Exhs. 2 at 3, 22; 5 at 5; 6; 7; 8.  No specific allegation in the Complaint contradicts these facts, which dooms this action to the extent it seeks to hold the Company liable for any disclosures or other conduct relating to the offerings.

2.      **The Complaint Fails to Allege *Scienter* With Respect to Company Statements Regarding Related-Party Transactions and Money Transfers**

Further, while Plaintiff alleges that NEP had "engaged in a course of conduct that involved numerous related-party transactions" (Complaint ¶ 32), it also alleges "neither the Board of Directors nor the Audit Committee was apprised of, much less approved, the 176 related-party transactions detailed in the [JLA Report]."  Complaint ¶¶ 6, 42.

Moreover, the Complaint fails to plead with particularity that the Company had the requisite *scienter* by allegedly failing to make disclosures regarding alleged money transfers to corporate insiders, related party transactions, and control persons and internal controls in its yearly and quarterly filings.  *See gen.* Complaint ¶¶ 50-53.  Instead, just as it does with the alleged related party transactions, the Complaint alleges that the Board was not apprised of and did not approve them.  Complaint ¶ 29.

When compared to and taken *collectively* with the facts the Complaint omits, these allegations do not give rise to a strong inference of *scienter* on the part of the Company.  *Tellabs*, 551 U.S. at 322-23.  Indeed, a more compelling inference of *non*fraudulent intent is drawn from the Board of Directors' lack of knowledge of the transactions complained of and the clean bill of health provided by JLA.  Given the information the Company did have, it cannot be said to have had the requisite *scienter* to satisfy Section 17(a) or 10(b).  Furthermore, the Complaint nowhere

alleges what accounting rules required the disclosures and that the Company was aware of the rules.[3]   The Complaint does not plead fraud with the particularity required by F.R.C.P. 9(b).

   **B.**   **Plaintiffs Cannot Plead the Company had the Requisite *Scienter* by Alleging Collective Conduct of Corporate Employees**

   Plaintiff may not plead *scienter* using a collective knowledge or conduct theory. *Teamsters Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 192, 195 (2d Cir. 2008)*; Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F. 3d 702, 707 (7th Cir. 2008) (inferring "collective intent" raises risk that fraud could occur through "a series of acts none of which was both done with scienter and imputable to the company" and rejecting attributing to a corporation a state of mind that employees lack).   The Complaint attempts to allege corporate *scienter* in this way by inferring the alleged conduct of individuals converge to form a corporate *scienter*.   *See e.g.* Complaint ¶ 32 (inferring that the alleged "course of conduct" by the individual defendants can also be attributed collectively to the Company).[4]   But the Complaint also alleges that neither the Board of Directors nor the Audit Committee was apprised of, much less approved the conduct of which Plaintiff complains.   Complaint ¶¶ 6 & 42. Thus, Plaintiffs allege the Company is both villain and victim.   This is the type of fraud by happenstance of which the Supreme Court warned in *Tellabs*.

   **C.**   **Even Assuming *Arguendo* that Alleged Misstatements of the Individual Defendants can be Attributed to the Company, the Complaint Fails Adequately to Plead Their *Scienter***

   Plaintiffs never allege that particular statements or conduct by individuals are attributable to the Company and, therefore, leave open to interpretation that the alleged actions are

---

[3]   The Company does not concede that it was required under accounting rules or principles to make the alleged "required" disclosures.

[4]   The allegations against individual defendants also fail.   *Infra* at Section C.

attributable to the individuals acting outside any capacity they may have had in the Company. Even if, however, the allegations of individual conduct is attributable to the Company, the Complaint fails to meet the heightened pleading standard required for pleading fraud as to individual defendants.  And for that reason alone, the Complaint fails to plead *scienter* against the Company.  We incorporate by reference the showings of defendants Jiang and Wang in their respective motions to dismiss.[5]

For example, the fraud claims against defendants Wang and (his mother) Guizhi Ju allege 176 undisclosed related-party transactions that purportedly resulted in the diversion of Company funds to personal use.  *See* Complaint, ¶¶ 3-4, 32-42.  In so doing, the Complaint relies heavily on the findings of a July 2010 forensic audit report conducted by John Lees & Associates (JLA) as purportedly revealing fraud in connection with the 176 undisclosed related-party transactions. ¶¶ 32-42.  In reality, the JLA Report contradicts the fraud allegations.  It includes express findings that there was "no evidence" that Mr. Wang or Ms. Ju ever improperly received Company funds for personal use and, further, that each of the 176 related-party transactions involved legitimate payments for corporate purposes.  Exh. 14 at 98.

V.    **CONCLUSION**

For all of the foregoing reasons, we respectfully request that the Court dismiss Counts 1 and 2 of the Complaint against the Company.

Dated: April 12, 2013                                    Respectfully Submitted,

---

[5]  This court may consider statements or documents incorporated into the Complaint by reference.  *E.g., ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  What is more, the *scienter* allegations against Ms. Ju are identical to those made as to Mr. Wang.  Therefore the Complaint fails to allege *scienter* as to Ms. Ju as well.  Further, the Complaint fails to allege with particularity that Ms. Ju exerted control over the Company in that: 1) there are no allegations that Ms. Ju *participated* in Board meetings much less a specific Board meeting rather than being an idle observer; 2) there are no allegations that the Board knew of her other actions; and 3) like the other alleged actions taken by Ms. Ju, the alleged negotiations with outside counsel would have been taken *utra vires*

By:   /s/ Michael J. Coffino

MICHAEL J. COFFINO
Coffino Law Group, LLP
201 Spear Street, Suite 1100
San Francisco, CA 94105
Tel:  415-426-3530
Fax: 415-426-3531
mcoffino@coffinolawgroup.com